UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

DAVID WAYNE CHRISTINE and               Case No. DK 08-03766
JOLEEN ANN CHRISTINE,                    Hon. Scott W. Dales
                                         Chapter 7

                Debtors.
_____/

CAPP EQUITIES, LLC,                       Adversary Pro. No. 08-80336

                Plaintiff,

v.

DAVID WAYNE CHRISTINE and
JOLEEN ANN CHRISTINE,

                Defendants.
_____/

**OPINION AND ORDER**

PRESENT:   HONORABLE SCOTT W. DALES
              United States Bankruptcy Judge

I.     INTRODUCTION AND JURISDICTION

Plaintiff Capp Equities, LLC filed a complaint against Defendants David and Joleen

Christine to except from discharge a debt arising from the Christines' alleged misrepresentations

in connection with the sale of an apartment building in the Chicago area.  The court held a trial

on May 12, 2010 in Kalamazoo, Michigan, during which Mark Cappetta ("Mr. Cappetta") and

Joleen Christine ("Ms. Christine") testified.  David Christine ("Mr. Christine") did not appear for

trial, though he did participate in pretrial proceedings.  The court finds that both witnesses were credible.  The following findings are based upon the testimony of those witnesses and the exhibits admitted at trial.

The court has jurisdiction over the Christines' bankruptcy case pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the automatic reference from the United States District Court for the Western District of Michigan.  *See* LCivR 83.2(a) (W.D. Mich.).  This adversary proceeding to except the Christines' debt from discharge is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## II.    FACTUAL FINDINGS & ANALYSIS

Prior to filing bankruptcy, David and Joleen Christine (the "Christines" or the "Defendants"), owned an apartment building located at 8133 and 8139 Ogden Avenue in Lyons, Illinois (the "Building").[1]  Pursuant to a real estate purchase agreement dated July 25, 2005 (the "Sale Contract"), the Christines sold the Building to Capp Equities, LLC ("Capp Equities" or the "Plaintiff"), an Illinois limited liability company owned by Mr. Cappetta and his mother.  At the closing, which took place on October 21, 2005, the parties executed an addendum to the Sale Contract (the "Addendum") wherein the Defendants agreed to escrow $12,000.00 to repair a certain RP2 backflow prevention valve.  (*See* Pl. Exh. 2).  Mr. Cappetta learned of the defective valve at the closing after reviewing an inspection report issued by the Village of Lyons (the "Inspection Report").  (*See* Def. Exh. C).  Under the Addendum, once the repair was made, Capp Equities was supposed to return any unused portion of the escrowed funds to the Christines.

Years later, because Capp Equities had not returned the balance of the escrowed funds, the Christines filed a lawsuit in state court against Capp Equities.  In the meantime, Mr. Cappetta discovered numerous problems with the Building, and was preparing a lawsuit on behalf of Capp

---

[1] Although there are two addresses associated with the Building, it is in fact one building.

Equities.  However, before Capp Equities could commence any state court lawsuit, the Christines filed a voluntary bankruptcy petition on April 29, 2008.

Capp Equities timely filed an adversary proceeding against the Christines under 11 U.S.C. § 523(a)(2) on August 18, 2008, claiming that the Christines made fraudulent misrepresentations to induce Capp Equities to purchase the Building.  More specifically, in its Complaint (the "Complaint"), Capp Equities contends that the Christines made misrepresentations concerning fire damage, tenant rental disputes, payment of water and utility bills, the condition of appliances and the roof, as well as the Building's occupancy levels, rental rates, and gross annual revenue.

Although the Christines initially retained counsel to defend them against Capp Equities's charges, they were without counsel by the time of trial.[2]   Indeed, Mr. Christine, apparently choosing not to participate, left Ms. Christine to mount a defense on her own.  As the court explained at the start of trial, Ms. Christine was only permitted to argue her own case and testify in her own defense because she is not an attorney.  *See* 28 U.S.C. § 1654; LBR 9010-2(a).

Ms. Christine argued that Capp Equities bought the Building at a large discount due to the myriad problems associated with it.  In addition, through the closing and pre-closing documents, Mr. Cappetta, as the managing member of Capp Equities, discovered the various problems, and in the course of several conversations and correspondence with Mr. Christine, negotiated even further discounts, primarily due to the aging roof.  Further, Ms. Christine argued that if Mr. Cappetta was harboring suspicions at closing because of contradictory statements and documents, or if he needed more time to inspect the Building, he could have halted the sale at or before closing.  Indeed, Mr. Cappetta admitted that at closing he consulted with two attorneys

---

[2] The court adjourned the trial for several months to permit the Christines to obtain replacement counsel, and to accommodate Mr. Christine's unspecified medical issues.

after reviewing the Inspection Report among other documents, yet proceeded to close based primarily on Mr. Christine's explaining away various concerns.  In short, Ms. Christine's argument challenged Capp Equities's reliance, suggesting that the company should have known better than to close if it harbored such doubts, and should not be permitted to, in effect, re-negotiate the deal many years later.

To prevail under 11 U.S.C. § 523(a)(2) as applicable to this case, Capp Equities must prove by a preponderance of the evidence[3] that:  (1) each defendant obtained money through a material misrepresentation known at the time to be false or made with gross recklessness as to its truth; (2) each defendant intended to deceive the plaintiff; (3) the plaintiff justifiably relied on the false representations and; (4) the plaintiff's reliance was the proximate cause of loss.  *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir. 1996) (*citing Atassi v. McLaren (In re McLaren)*, 990 F.2d 850, 852 (6th Cir. 1993) and *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir. 1986)).  If the Plaintiff fails to establish any of these elements, its case fails.

Having sat through the trial, and putting aside the applicable law for a moment, the court would be inclined to agree with Ms. Christine's admonition that Capp Equities should have known better, and that the company's reliance was not reasonable.  The United States Supreme Court, however, has held that the proper measure of reliance -- when a portion of a debtor's discharge is in question -- is not an objective or "reasonable" standard, but a less demanding "justifiable" reliance standard.  *Field v. Mans*, 516 U.S. 59, 68 (1995).  This standard prevents the bankruptcy court from becoming a haven for fraudsters who prey on the unwitting and even the foolish.

Accordingly, in order to show *justifiable* reliance, the Plaintiff is not required to demonstrate that the falsity of the representation was so well crafted as to be virtually

---

[3] *Grogan v. Garner*, 498 U.S. 279, 291 (1991)

Page 5 of 16

undetectable.  Reliance may be "justifiable" even though an investigation would have revealed the falsehoods.  *Id*. at 69.  In addition, justifiable reliance is not dependent upon a community standard that applies to all cases, but instead depends upon the qualities and characteristics of the particular individual who relies on the particular representation.  *Id*. at 71.

Because analysis of the reliance element will be the same for each count, the court makes a finding as to all counts that Capp Equities's reliance on the written and oral statements of the Christines was "justifiable" within the meaning of 11 U.S.C. § 523(a)(2), as interpreted in *Field.* Even though Mr. Cappetta reviewed the Inspection Report at closing and was aware of potential problems with the Building, in most cases Mr. Christine assuaged Mr. Cappetta's concerns with potentially plausible explanations at or before closing.  With respect to many of Mr. Cappetta's other concerns, Mr. Christine offered similar prevarications about the leases, the tenants, and the utilities, among other issues.  Although the record presents a close call regarding justifiable reliance, the court cannot accept the Christines' defense of *caveat emptor* when the federal bankruptcy discharge policy is involved.  Congress reserved the discharge for honest but unfortunate debtors, and the more lenient "justifiable reliance" standard advances this goal. Throughout the trial, Mr. Cappetta repeated the same refrain:  Capp Equities took the Defendants' statements at face value, whether made in the Sale Contract, by emails, or orally, and relied on these statements to its detriment.  This reliance proved unwise, but nevertheless justifiable.

The court now turns to address each specific count in the Complaint, evaluating each count in view of the testimony and other evidence adduced at trial.

A.       <u>Count I -- The Water Bills</u>

Capp Equities contends the Christines misrepresented that they had paid all past-due water bills associated with the Building.  In support, Capp Equities offered the Affidavit of Title Covenant and Warranty (the "Affidavit") (Pl. Exh. 3) executed by the Christines at the closing. The Affidavit states in pertinent part that "all water taxes, except the current bill, have been paid, and that all insurance policies assigned have been paid for."

Mr. Cappetta testified that at the closing, Mr. Christine said he had just left the Village of Lyons office where he paid the water bills so the parties could close.  In fact, according to Mr. Cappetta's testimony, the day after closing he discovered there were several past due water bills that remained unpaid, and on November 7, 2005, in order to keep the water flowing, Mr. Cappetta wrote a check for $257.09.  Later, Mr. Cappetta received two more water bills, one for each meter,[4] and each for the billing period of September 16, 2005 through November 15, 2005. Mr. Cappetta paid the bills with two checks that reflect in the memo section the *pro rata* share due for pre-closing and post-closing balances.  (Pl. Exh. 8).

The Christines' Affidavit, however, does not support Capp Equities's relief on this count because the Christines represent only that they paid everything but the "current bill."  Because the bills themselves reflect a billing period of September 16, 2005 through November 15, 2005, the court finds that the portion paid by the Plaintiff for the period of September 16, 2005 through October 21, 2005 was the "current" bill as of the closing.  The second checks were clearly for a post-closing period.  As for the payment made on November 7, 2005 by Mr. Cappetta of $257.09, there is no notation on the receipt, nor any evidence regarding what period of time this bill reflected.

---

[4] The water company assigned a separate meter to each address.

Therefore, the Plaintiff has not met its burden to establish that the amounts paid by Capp Equities for the water bills were on account of a past due bill as opposed to a current one. Consequently, the court finds that the Defendants' representations in the Affidavit, that all water bills were paid except for the "current" bill, were not false, and the debt for damages described in Count I of the Plaintiff's Complaint is dischargeable.

B.    Count II -- Utility Services

Capp Equities contends that the Christines misrepresented the status of pre-closing payments for utility services other than water, such as gas and electricity. In the Sale Contract (Pl. Exh. 4) signed by both Mr. Cappetta and Mr. Christine, paragraph 20e states:

> Seller warrants, represents and covenants:
>
> > Seller has received no written notice of any claims, causes of action or other litigation or proceedings pending or threatened in respect to the ownership or operation of the Property or any part thereof (including disputes with tenants, mortgages, governmental authorities, utilities, contractors, adjoining land owners and suppliers of goods and services) . . .

Pl. Exh. 4 at p. 3. The court notes that the Plaintiff has not produced any evidence of written notices of claims, causes of action or other pending or threatened proceedings regarding the utilities or their non-payment. However, based upon Mr. Cappetta's unrefuted testimony and other supporting documentation, the court finds that Mr. Christine made several misrepresentations concerning the condition of the gas and electrical operations at the Building.

First, in the Sale Contract, Mr. Christine warrants that "the HVAC, electrical, and plumbing systems are in good operating condition." (Pl. Exh. 4, ¶ 20b). There is no evidence that this document, executed three months before closing, was reaffirmed in connection with the closing, but it is evidence of certain initial material representations made by Mr. Christine as part

**Page 8 of 16**

of the overall condition of the Building, any change of which should have been related to Capp Equities at or before closing.

In an email to Mr. Cappetta dated August 5, 2005, Mr. Christine states, "I am having some gas lines upgraded since I put a new boiler in last winter so the gas may be off for a day or two until Nicor finishes it's [sic] job."   (Pl. Exh. 8).   When Mr. Cappetta was given the Inspection Report on October 21, 2005 at closing, indicating there was "no gas to building,"  Mr. Christine said this was because the gas bill and service needed to be put in Mr. Cappetta's name. This statement suggests that the utility company needed to turn off service to accomplish this change.

One day after closing, the utility company found an unsatisfactory condition at 8133 Ogden having to do with the boiler.  (Pl. Exh. 8).  At the same time, Mr. Cappetta discovered the electricity was shut off to the parts of the Building that controlled the hot water heaters and the boiler -- portions of the Building that were the landlord's responsibility rather than the tenants'. Because the utility company would not restore gas service to the Building until the boiler had been repaired, and because the boiler could not be repaired until electrical service was restored, Mr. Cappetta needed to restore the electricity to the common areas within 8133 Ogden. According to Mr. Cappetta's testimony, the tenants in the Building had been without hot water since early August.

On November 9, 2005, Mr. Cappetta was able to get the electricity turned back on at no cost.  He hired a heating and cooling company to repair the boiler and other related issues for which he paid $479.00.  (Pl. Exh. 8).  He then incurred $1,304.00 to restore gas service, and testified that he was required to give rent abatements of $1,625.00, for the 20 day period between the closing and the utility restoration.   Based upon this evidence, the court finds that Mr.

Christine made material misrepresentations regarding the operating condition of the utilities and the HVAC system. The proofs, however, are devoid of any evidence that Ms. Christine made similar misrepresentations. The court notes that to the extent Capp Equities relies on representations made in the Sale Contract, Ms. Christine did not sign that agreement, and the court is therefore unwilling to charge her with the statements contained within that document.

As far as the record shows, Ms. Christine had no communication with Mr. Cappetta or Capp Equities between the time Mr. Cappetta contacted her as listing agent for the Building until the day of closing. Ms. Christine did not sign the Sale Contract, and there is no evidence that she made any specific oral representations about the HVAC system or utilities at or before the closing.

Next, the Plaintiff is required to prove that Mr. Christine knew his statements were false or made with gross recklessness as to the truth at the time they were made. The court finds this to be the case. Mr. Christine knew the gas was turned off in early August. (Pl. Exh. 8). He convinced Mr. Cappetta that the gas service was only temporarily interrupted because of the supposed need to change the billing name and address. This he either knew to be false or he said with gross recklessness as to the truth. Perhaps Mr. Christine thought the boiler was repaired, but it is reasonable to infer from the number of times Mr. Cappetta attempted to set up a complete inspection of the Building that Mr. Christine knew it was not. Therefore, the court finds that Mr. Christine's statements regarding the utilities and the HVAC system were false or made with gross recklessness as to the truth.

An intent to defraud under 11 U.S.C. § 523(a)(2)(A) is determined under a subjective standard. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). Whether a debtor intended to perform or deliver as promised is a factually

intensive inquiry and, since a debtor will rarely admit to acting in a fraudulent manner, circumstantial evidence usually must suffice in determining whether the debtor acted with the requisite fraudulent intent. *Weeber v. Boyd (In re Boyd)*, 322 B.R. 318, 324 (Bankr. N.D. Ohio 2004).

By executing the Sale Contract, Mr. Christine made several representations. (Pl. Exh. 4). He attended the closing without correcting its various misstatements or otherwise correcting the material items that had changed. He orally verified that the gas and electric bills were paid and those utilities were running to the Building. He even stated in an email that he had the gas lines "updated." In the same email, he said he had recently replaced the boiler which gave the false impression that it was in operating condition on the closing date. The only time Mr. Christine showed Mr. Cappetta certain apartments in the Building, they were without tenants. On the one day he showed the Building, electricity was on in the common areas, but Mr. Cappetta was never able to see the interior of the Building again, at least not until after the closing. All of these circumstances permit the court to infer fraudulent intent on the part of Mr. Christine. By failing to participate in the trial, Mr. Christine prevented the court from considering his side of the story.

Consequently, the court finds that the damages suffered by Capp Equities regarding the utility services and the HVAC repairs in the amount of $3,408.00, are not dischargeable as to Mr. Christine only; the Plaintiff did not establish this count of its complaint as to Ms. Christine.

C.    Count III -- Roof Leaks

In the Sale Contract, Mr. Christine specifically represented there were no roof leaks. (Pl. Exh. 4, p. 3, ¶ 20a). On September 20, 2005, Mr. Cappetta asked Mr. Christine for a price concession of $50,000.00 citing the need for "several deferred maintenance items," including roof replacement and "some gutter repair and reattachment work." (Pl. Exh. 1). At the closing,

the Christines agreed to reduce the purchase price by giving Capp Equities a $35,000.00 "Repair Credit." (Pl. Exh. 5).

Mr. Cappetta testified that he knew the roof was old and would need replacement in the near future. This is, among other things, what he meant by "deferred maintenance items." But he did not know at the time of the closing that the roof was actually leaking, and as a result three apartments were uninhabitable thus causing Capp Equities to lose rental income on Unit 8 in 8133 Ogden, and Units 7 and 8 in 8139 Ogden. They were vacant for four, five and six months respectively. (Pl. Exh. 10).

Although Capp Equities got credit at the closing for the cost of the roof repairs, the parties did not resolve any issues regarding lost income related to the three apartments that could not be rented. Indeed, in September when they initially agreed on the $50,000.00 reduction, Mr. Cappetta was not aware the units were not inhabitable. Unit 8 in 8133 Ogden had a rental rate of $675.00 per month; Unit 7 in 8139 Ogden had a rental rate of $700.00 per month; and Unit 8 in 8139 Ogden had a rental rate of $635.00 per month. (Pl. Exh. 10).

Both Defendants signed a closing statement (the "Closing Statement") on October 21, 2005, listing each apartment as either rent producing or vacant. This listing omitted any reference to the vacancy of Unit 8 in 8133 or Units 7 and 8 in 8139 Odgen. Instead, as far as it appeared from the Closing Statement, these three units were occupied by paying tenants. In addition, the Defendants provided Mr. Cappetta with several lease assignments, which included the leases for these three units even though the tenants were gone. (Pl. Exh. 11). Based upon this evidence, the court finds that the Defendants made material misrepresentations, known at the time to be false or made with gross recklessness as to the truth of the matters asserted. The court further finds that based upon the totality of the circumstances, including the Defendants' need to

be free of this Building and their knowledge of the inexperience of the buyer, they made these statements with the requisite intent to induce the Plaintiff to buy the Building under false pretenses.

As for damages, the court finds that the Plaintiff has been compensated for the actual roof repairs in the form of a credit at closing.  The Plaintiff has not, however, recovered the lost income from these units resulting from the separate water damage to the units.  Therefore, the court finds that the lost rent damage claims on account of these units are not dischargeable in the bankruptcy as to both Defendants in the amounts of $2,700.00 for Unit 8 in 8133 Ogden; $4,200.00 for Unit 7 in 8139 Ogden; and $3,175.00 for Unit 8 in 8139 Ogden, for a total of $10,075.00.

D.    Count IV -- Apartment Vacancies and Rental Rates

At trial, Mr. Cappetta testified that Unit 5 in 8139 Ogden was also vacant due to extensive damage done by a previous tenant.  The Defendants noted this vacancy on the Closing Statement.  Even so, Mr. Cappetta testified that the Defendants never told him about the apartment's condition or that it would require several months to get it back on the market.  However, Capp Equities presented no evidence regarding when this damage occurred or whether the Defendants had any knowledge of its condition beyond their disclosure that the unit was vacant.  Therefore, the court finds that the damages regarding Unit 5 in 8139 Ogden will not be excepted from discharge.

In addition to the lost rental income for these apartments, in this count, the Plaintiff seeks damages for the Defendants' misrepresentation that fourteen of the sixteen apartments were rented when in fact only eleven units were producing rental income.  Further, the Plaintiff argues that in their monthly report, given to Capp Equities before closing, the Christines specified the

amounts received for each rental unit, when in fact, after closing it became clear that some of the tenants were actually obligated to pay less than the amount disclosed. Due to these overstatements, the monthly rental income was falsely inflated. This in turn overstated the annual income stream, which was a crucial factor upon which Capp Equities relied in setting the purchase price. Mr. Christine's misstatement induced Capp Equities to overpay for the Building.

The court finds, however, that this count is subsumed into Count VI for annual income. To award a non-dischargeable judgment under both counts would result in a double recovery for the Plaintiff on lost rental income as it relates to an inflated sale price of the Building.

### E.    Count V -- Fire Damage

In addition to the three units that remained vacant due to the leaky roof, and the other unit damaged by the tenant, Mr. Cappetta contended that an additional apartment, Unit 2 in 8133 Ogden, was purportedly damaged by a fire. As with Unit 5 in 8139 Ogden, the Defendants noted the Unit 2 vacancy on the Closing Statement. Moreover, the Inspection Report that the Defendants provided to Mr. Cappetta at closing informed him about the fire. Mr. Christine, however, endeavored to minimize the effect of the Inspection Report by telling Mr. Cappetta that the fire was a small kitchen fire causing minimal damage, and there was no reason why the apartment could not be immediately rented. In fact, Mr. Cappetta credibly testified that the damage was so extensive he needed 12 months to gut and fix Unit 2, thus losing $675.00 per month in rental income over that year. (Pl. Exh. 10).

Although this unit was correctly listed as vacant in the Closing Statement, the court finds that Mr. Christine made an intentional and material misrepresentation, which he knew to be false at the time he made it, when he underplayed the extent of the damage to the unit and its habitability. For her part, however, Ms. Christine made no further verbal representations about

the extent of the fire damage, and the proofs show that she correctly represented that the apartment was vacant on the Closing Statement bearing her signature. There was no evidence that she knew anything further. Consequently, the court finds that the damages caused by Mr. Christine's misrepresentations in connection with Unit 2 at 8133 Ogden of $8,100.00 will be excepted from Mr. Christine's discharge only.

F.      Count VI -- Annual Revenues

Count VI encompasses the bulk of Capp Equities's damage claim. In the Sale Contract (Pl. Exh. 4, ¶ 20c), Mr. Christine represented:

> That gross annual revenue from the building exceeded all expenses annually, excluding depreciation and interest on indebtedness, by Eighty Thousand Dollars ($80,000) or more for the calendar year ended 12/31/2004 . . .

However, the Christines' Tax Form 8825 for 2004 (Pl. Exh. 17) shows a net rental amount for the Building of $26,632.00. Likewise, for 2005, up until October 21, the net rental balance was $29,032.00. From this evidence, and Plaintiff's concessions at trial, the court infers that the actual gross annual revenue for the Building was actually about $60,000.00.

Mr. Cappetta testified that he calculated the purchase price of the Building using the $80,000.00 gross annual revenue number represented by Mr. Christine, and divided it by an 8% capitalization rate.[5] Performing this calculation, Capp Equities offered, and the Christines accepted, $1,000,000.00 as the purchase price for the Building. Mr. Cappetta further testified that he told Mr. Christine on several occasions that he was basing his purchase price on this calculation. He also testified that had he known the actual gross revenue was roughly $60,000.00, he would not have paid more than $750,000.00 for the Building.

---

[5] At trial, Ms. Christine questioned the 8% capitalization rate but offered no evidence to dispute its accuracy. Given the price that Capp Equities paid for the Building, it is clear that the company used that rate and Mr. Christine's representations regarding gross annual revenue in making its purchase decision.

The court finds that Mr. Christine's representation in the Sale Contract regarding a gross annual revenue of $80,000.00 for the Building was a material misrepresentation, known at the time to be false, and made with the intent to induce Capp Equities to pay $1,000,000.00 for the Building. Again, however, the record contains no evidence that Ms. Christine -- who did not sign the Sale Contract -- made any such specific representation regarding gross annual revenue. Therefore, the court finds that $250,000.00 is a fair measure of Capp Equities's damages arising from Mr. Christine's misrepresentation regarding gross annual revenue derived from the Building. The court arrived at this figure by taking the difference between the income-based value of the Building as represented ($1,000,000.00 purchase price) and the actual income-based value using gross annual revenue of $60,000.00 and an 8% capitalization rate ($750,000.00). Accordingly, with respect to Count VI, Mr. Christine owes Capp Equities a non-dischargeable debt in the amount of $250,000.00.

G.      Count VII -- Damaged Appliances

The Plaintiff claims that 17 appliances were broken or inoperable and the Defendants were aware of this on or before the closing. Other than an Affidavit of Michael F. Cappetta (Pl. Exh. 14), delineating the damaged items and the out-of-pocket cost of replacing them, there is nothing in the record, including the Sale Contract or Closing Statement, evidencing any representations made by the Defendants regarding the condition of the appliances. Therefore, the court finds that any damages regarding the replacement of the appliances are dischargeable in the Defendants' bankruptcy.

H.      Count VIII -- Tenant Disputes

In its Complaint, the Plaintiff stated that eleven tenants had refused to pay rent because they were not receiving utility service or they disputed their rental obligations. The Plaintiff

claims that Mr. Christine represented in the Sale Contract that he had received no written notice of any tenant disputes. (Pl. Exh. 4, ¶ 20e). The Plaintiff, however, presented no proofs regarding this claim and no evidence of any written notice regarding the tenant disputes. Therefore, the court finds that any damages suffered by the Plaintiff under this count are discharged in the Defendants' bankruptcy.

### III.   CONCLUSION AND ORDER

In view of the court's findings, the court will prepare a separate judgment against Ms. Christine and Mr. Christine in the amount of $10,075.00 (Count III) and against Mr. Christine only in the amount of $261,508.00 (Counts II, V and VI). The judgment shall declare that these debts shall be excepted from discharge under 11 U.S.C. § 523(a)(2)(A). The Defendants' liability to the Plaintiff shall be joint and several only with respect to the $10,075.00 awarded on account of Count III.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall enter a judgment in conformance with this Opinion and Order.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order, and the judgment to be entered, upon David and Joleen Christine and Mark Hunting, Esq. pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4.

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: June 14, 2010**